FT. PIERCE UTILITIES AUTHORITY OF the CITY OF FT. PIERCE, et al., Petitioners,

v.

UNITED STATES of America, and the Nuclear Regulatory Commission, Respondents,

Florida Power & Light Co., City of Mount Dora, Florida, City of Lake Helen, Florida, Intervenors.

FT. PIERCE UTILITIES AUTHORITY OF the CITY OF FT. PIERCE, et al., Petitioners,

v.

NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

City of Mount Dora, Florida, Florida Power and Light Co., City of Lake Helen, Florida, Intervenors.

Nos. 77–1925, 77–2101.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1978.

Decided March 23, 1979.

As Amended March 23, 1979.

Certiorari Denied Oct. 1, 1979. See 100 S.Ct. 83.

Robert A. Jablon, Washington, D. C., for petitioners.

Stephen F. Eilperin, Sol., Nuclear Regulatory Commission, Washington, D. C., with whom James L. Kelley, Acting Gen. Counsel, Nuclear Regulatory Commission, John J. Powers, III, and Andrea Limmer, Attys., U. S. Dept. of Justice, Washington, D. C., were on the brief, for respondents.

J. A. Bouknight, Jr., Washington, D. C., for intervenor, Florida Power and Light Co.

Robert A. Jablon and Daniel Guttman, Washington, D. C., entered appearances for intervenors, City of Mount Dora and City of Lake Helen.

Before WRIGHT, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

These consolidated petitions for review present two issues: (1) whether section 186(a) of the Atomic Energy Act (Act) vests the Nuclear Regulatory Commission (NRC or Commission) with antitrust authority over operating licenses for nuclear facilities other than that provided in section 105, and (2) if so, whether section 186(a) authorizes postlicensing antitrust review of the section 104(b) operating licenses at issue here.[1]

In No. 77–1925, petitioners, the Florida Municipal Utilities Association and a group of Florida municipalities and municipal electric systems (Florida Cities), challenge a

---

1. The statutory provisions governing the licensing and antitrust review of nuclear facilities are reproduced in full at the conclusion of this opinion. *See* pages ———— of 196 U.S. App.D.C., pages 1001–1004 of 606 F.2d *supra*.

decision of the NRC's Director of Nuclear Reactor Regulation rejecting Florida Cities' request that he initiate proceedings to show cause why operating licenses issued under section 104(b) to intervenor, Florida Power & Light Co. (FP&L), for three nuclear plants—St. Lucie No. 1 and Turkey Point Nos. 3 and 4 (the operating plants)—should not be revoked, amended, or otherwise modified on antitrust grounds pursuant to section 186(a). In No. 77–2101, Florida Cities seek review of a decision of the Atomic Safety and Licensing Appeal Board denying their petition for leave to intervene out of time and for an antitrust hearing under section 186(a) with regard to the operating plants.

For reasons stated below, we conclude that even assuming that section 186(a) vests the Commission with antitrust authority over operating licenses other than that provided in section 105, it does not, by its own terms, authorize postlicensing antitrust review of the section 104(b) operating licenses at issue here. Accordingly, we pretermit the question whether section 105 is the Commission's exclusive grant of antitrust authority over operating licenses for nuclear facilities.

I

The Atomic Energy Act provides for two types of construction permits and operating licenses for nuclear facilities: (1) those issued under section 104(b), known as "research and development" licenses, which are subject only to "the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its [licensing] obligations," and (2) those issued under section 103, known as "commercial" licenses, which are subject to full-scale Commission regulation.[2] Atomic Energy Act §§ 102–104, 42 U.S.C. §§ 2132–2134 (1976). This licensing scheme, enacted in an era when the practical value of nuclear energy was in doubt, was designed to promote the

development of nuclear energy by minimizing the extent of government regulation until such time as its practical value was established. Accordingly, the Act, prior to 1970 when it was amended, authorized the Commission to issue "commercial" licenses under section 103 only upon a finding that "any type of utilization or production facility ha[d] been sufficiently developed to be of practical value for industrial or commercial purposes." Atomic Energy Act, ch. 1073, § 102, 68 Stat. 936 (1954) (amended 1970). Section 104(b), by contrast, authorized the Commission, absent a finding of "practical value," to issue "research and development" licenses, subject to minimum regulation, for "utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes." It was pursuant to section 104(b) prior to the 1970 amendments that FP&L received its construction permits for Turkey Point Nos. 3 and 4 on April 29, 1967, and for St. Lucie No. 1 on July 1, 1970.

In late 1970, Congress amended the Act, abolishing the requirement that the Commission make a finding of "practical value" before issuing "commercial" licenses. Atomic Energy Act § 102(a), 42 U.S.C. § 2132(a) (1976). Thereafter, the Commission, when licensing "utilization or production facilit[ies] for industrial or commercial purposes," was required to issue "commercial" licenses under section 103, rather than "research and development" licenses under section 104(b). The Act as amended, however, contained a provision authorizing the Commission to issue operating licenses under section 104(b) for nuclear plants that previously had been licensed for construction as "research and development" facilities. *Id.* § 102(b), 42 U.S.C. § 2132(b). Acting pursuant to this grandfather clause, the Commission, on July 19, 1972, April 10, 1973, and March 1, 1976, issued operating licenses under section 104(b) to FP&L for

---

**2.** The most significant distinction between section 104(b) licenses and section 103 licenses is that the former (with a limited exception not applicable here), unlike the latter, have been, and continue to be, exempt from prelicensing antitrust review under section 105(c). *See* Part II.A *infra*.

Turkey Point Nos. 3 and 4 and St. Lucie No. 1, respectively.

No one requested, nor did the Commission conduct, an antitrust inquiry in connection with the licensing of the three facilities at issue here. During the period in which FP&L received construction permits for the operating plants, the Act did not expressly authorize the Commission to conduct prelicensing antitrust review for "research and development" facilities. In fact, this court, in *Cities of Statesville v. Atomic Energy Commission*, 142 U.S.App.D.C. 272, 282–286, 441 F.2d 962, 972–76 (1969) (en banc), held that, under the pre-1970 Act, the Commission was not permitted to consider antitrust matters in issuing section 104(b) licenses. This blanket immunity from prelicensing antitrust review for "research and development" facilities was modified in 1970 when Congress, in amending the Act, authorized the Commission to review on antitrust grounds applications for operating licenses under section 104(b) where the party requesting such review previously had sought antitrust review at the construction permit stage and renewed the request in writing within a specified time period. Atomic Energy Act § 105(c)(3), 42 U.S.C. § 2135(c)(3) (1976). The operating licenses at issue here, however, fell outside this limited exception, because, as indicated above, no antitrust objections were raised during the construction permit proceedings.

The first request for antitrust review of the licenses for FP&L's operating plants was made on August 6, 1976, when Florida Cities petitioned the NRC for late intervention, on antitrust grounds, in a construction permit proceeding for another FP&L plant, St. Lucie No. 2, and joined with that petition a request for an antitrust hearing on the three plants that already had received operating licenses. Among other responses to the request for antitrust review of the three operating licenses, the NRC staff and FP&L argued that the request should have been filed not with the Commission as a

request for an antitrust hearing, but rather with the Commission's Director of Nuclear Reactor Regulation as a request for a proceeding requiring FP&L to show cause why its operating licenses for the three plants should not be revoked or conditioned. On October 29, 1976, Florida Cities, though insisting that the Commission in fact had jurisdiction, lodged with the Director a copy of its request for antitrust review of the three operating licenses.

The Commission meanwhile referred Florida's Cities' petition of August 6, 1976 to an Atomic Safety and Licensing Board (Licensing Board), which, on April 5, 1977, denied the request for an antitrust hearing on the licenses for the three operating plants.[3] The Licensing Board based this decision on a ruling in another proceeding, *Houston Lighting and Power Co.*, 5 N.R.C. 582, 592 (1977), where the Atomic Safety and Licensing Appeal Board (Appeal Board) held that the Commission had not endowed its licensing boards "with jurisdiction to direct a hearing on antitrust matters—by a grant of an intervention petition or otherwise—in the absence of a pending construction permit or operating license proceeding." J.A. 279.

In addition to filing an appeal to the Appeal Board, Florida Cities filed with the Commission itself a motion for "clarification of procedures," seeking, *inter alia*, a declaratory order regarding the most appropriate procedural mechanism to obtain antitrust review of the licenses for FP&L's operating plants. On June 22, 1977, the Commission, ruling that this motion was improperly filed with the Commission, referred it to the Appeal Board or the Director of Nuclear Reactor Regulation for initial consideration.

On August 23, 1977, the Appeal Board both affirmed the Licensing Board's decision denying Florida Cities' request for antitrust review of the three operating plants

---

**3.** The Licensing Board granted Florida Cities' petition for late intervention, on antitrust grounds, in the construction permit proceeding under section 103 for St. Lucie No. 2. That

decision, affirmed by the Appeal Board and the Commission, is not before us on the petitions for review in the instant case.

and disposed of Florida Cities' motion for "clarification of procedures." In affirming the Licensing Board, the Appeal Board relied on its ruling in *Houston Lighting* that, under NRC regulations, a licensing board has no authority, absent a pending construction permit or operating license proceeding, to conduct an antitrust hearing. The Appeal Board then foreclosed the remaining avenues of NRC antitrust review, disposing of Florida Cities' motion for "clarification of procedures" on the statutory ground "that (with certain exceptions not applicable here) once the operating license proceedings terminated this agency's antitrust responsibilities relating to these reactors came to end." J.A. 376. In so construing the Act, the Appeal Board noted (1) that, with certain exceptions not applicable here, Congress, in 1970, had exempted licenses issued under section 104(b) from antitrust review under section 105(c), (2) that the Commission, in its own decision in *Houston Lighting & Power Co.*, 5 N.R.C. 1303 (1977), had ruled that section 105 encompassed all the Commission's antitrust responsibilities, and (3) that, even if the Commission were authorized under section 186(a) to exercise additional and continuing antitrust responsibilities, it could not invoke that authority here inasmuch as section 186(a), by its own terms, provided for license revocation "because of conditions revealed . . . which would warrant the Commission to refuse to grant a license on an original application," and, according to the Appeal Board, "by Congressional mandate antitrust considerations were not grounds for refusing operating licenses to . . . 'research and development' facilities [such as those at issue here]." The

Appeal Board concluded its opinion by noting that the statutory proscription against Commission antitrust review applied with equal force to the Commission's Director of Nuclear Reactor Regulation with whom Florida Cities also had filed its antitrust allegations.

Relying on the reasons set forth in the Appeal Board's decision, the Director of Nuclear Reactor Regulation, on September 9, 1977, denied Florida Cities' request that he institute a proceeding requiring FP&L to show cause why the licenses for the operating plants should not be revoked or modified on antitrust grounds.

On October 26, 1977, the Commission declined to review the Appeal Board's decision but referred Florida Cities' antitrust allegations to the Justice Department.[4] Following this decision, Florida Cities filed petitions for review of the Appeal Board's decision (No. 77–2101) and the Director of Nuclear Reactor Regulation's refusal to institute show cause proceedings (No. 77–1925). This court granted Florida Cities' motion to consolidate the two petitions and FP&L's motion to intervene in the proceedings.

## II

It is undisputed that, on the facts presented here, FP&L's operating licenses are not subject to antitrust review under section 105, a provision cataloguing several areas of Commission antitrust authority in licensing nuclear facilities. Florida Cities, however, argue that section 186(a), a provision governing license revocation, vests the Commission with antitrust authority other than that provided in section 105 and that the operating licenses at issue here are sub-

---

4. In the order denying review, the Commission observed:

> In a recent decision, *In the Matter of Houston Lighting & Power Company* (South Texas Project, Unit Nos. 1 & 2), we discussed our antitrust responsibilities, as set forth in Section 105 of the Atomic Energy Act, as amended, 42 U.S.C. § 2135. There we stated that "antitrust allegations might be raised outside the license review context. Subsequent allegations that licenses are being used in such a way as to violate the antitrust laws are to be referred to the Department of Justice for in-

vestigation and possible enforcement action . . . ." The Florida Cities petition contains such allegations.

> The staff is therefore directed promptly to refer to the Attorney General the allegations of the Florida Cities, as well as "any [related] information it may have [if any] with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation" of any of the antitrust laws. 42 U.S.C. § 2135(b).

J.A. 411–12.

ject to antitrust review under section 186(a). In response, the Commission and FP&L contend (1) that section 105 is the Commission's exclusive grant of antitrust authority in licensing nuclear facilities, and (2) that even if the Commission's antitrust powers are not bounded by section 105, section 186(a) does not authorize postlicensing antitrust review of the section 104(b) operating licenses in question.[5]

### A.

Before turning to these arguments, we find it useful to review the history of the statutory provisions at issue here. Prior to 1970, section 105 vested the Commission with three areas of antitrust authority. Atomic Energy Act, ch. 1073, § 105, 68 Stat. 938 (1954) (amended 1970). First, section 105(a), which specified that nothing in the Act preempted various sections of the Sherman, Clayton, and Federal Trade Commission Acts, provided that "[i]n the event a licensee is found by a court . . . to have violated any of the provisions of such laws in the conduct of licensed activity, the Commission may suspend, revoke, or take such other action as it may deem necessary with respect to any license issued by the Commission under the provisions of this Act." Second, section 105(b) required the Commission to report to the Attorney General "any information it may have with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation of [the antitrust provisions mentioned in section 105(a)], or to restrict free competition in private enterprise." Third, section 105(c) created a procedure governing the issuance of section 103 licenses under which (1) the Commission, if it proposed to issue such a license, was required to notify the Attorney General of the proposed license and the terms and conditions thereof, (2) the Attorney General then was required, within a

reasonable time, to "advise the Commission whether, insofar as he can determine, the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws," and (3) "such advice [was to] be published in the Federal Register."

The pre-1970 Act also included a provision, section 186(a), which outlined the grounds that would warrant the Commission to revoke a license. That provision, which has not been amended since its enactment in 1954, states that:

> *Any license may be revoked* for any material false statement in the application or any statement of fact required [under section 182], or *because of conditions revealed by such application or statement of fact or any report, record, or inspection or other means which would warrant the Commission to refuse to grant a license on an original application*, or for failure to construct or operate a facility in accordance with the terms of the construction permit or license or the technical specifications in the application, or for violation of, or failure to observe any of the terms and provisions of this chapter or of any regulation of the Commission.

Atomic Energy Act § 186(a), 42 U.S.C. § 2236(a) (1976) (emphasis added).

In *Cities of Statesville v. Atomic Energy Commission*, 142 U.S.App.D.C. 272, 441 F.2d 962 (1969), this court, sitting en banc, discussed at some length the scope of the Commission's antitrust responsibilities under the licensing and antitrust review provisions in effect prior to 1970. The apparent conflict in *Statesville* was the fact that the Commission, without regard to antitrust considerations, had issued construction permits under section 104(b) for several nuclear power plants. In issuing those permits, the Commission had rejected petitioners' contentions (1) that the permits should have

---

**5.** Though concurring in the result reached below, the United States, as co-respondent, "does not necessarily concur in the [Commission's] reliance on [its *Houston Lighting*] decision." Respondents' Joint Brief at 8 n.4. It was in *Houston Lighting* that the Commission held

that, with limited exceptions not applicable here, its "antitrust authority is defined not by the broad powers contained in Section 186, but by the more limited scheme set forth in Section 105." 5 N.R.C. at 1317.

been issued under section 103, rather than under section 104(b), and (2) that even if section 104(b) were applicable, the Commission nonetheless should have reviewed the applications for possible antitrust violations. At oral argument before this court, it became apparent, however, that petitioners were "not really opposed to the construction of the plants, but [were] apprehensive about the possible impact of the [then existing] ownership arrangements upon the future availability of power to themselves as customers." *Id.* at 288, 441 F.2d at 979 (McGowan, J., concurring). There is, therefore, some uncertainty regarding the nature of the controversy presented in *Statesville.*

It nonetheless is clear that the court in *Statesville* addressed two issues relevant here. First, the court, in Judge Tamm's majority opinion, affirmed the Commission's decision to proceed under section 104(b) on the ground that there had not been an adequate demonstration of the practical value of such facilities for industrial or commercial purposes. *Id.* at 279–82, 441 F.2d at 969–72. But, as Judge Leventhal noted in his concurring opinion joined by Judges Wright and Robinson "[t]he key ruling of the court endorsed by all its members" was not the court's holding that the construction permits were properly issued under section 104(b), but rather "that in the event of an intervening conclusion of the existence of practical value, the statute require[d] that operating license[s] be issued under § 103." *Id.* at 294, 441 F.2d at 984. Thus, the court plainly contemplated that, in the event of an intervening finding of "practical value," a licensee would be required to obtain a section 103 operating license (subject to prelicensing antitrust review under section 105(c)) for a facility that

had been built pursuant to a section 104(b) construction permit (exempt, according to the *Statesville* majority, from any prelicensing antitrust review).

Second, in light of the plain language and legislative history of section 105 as well as the overall structure of the Act, Judge Tamm concluded that the Commission, in issuing construction permits or operating licenses under section 104(b), was not permitted to consider antitrust matters. *Id.* at 282–286, 441 F.2d at 972–76. But the nuclear facilities at issue in *Statesville* were not, in Judge Tamm's view, completely immune from Commission antitrust review. In addition to the possibility that the operating licenses for these facilities might be issued under section 103 (and therefore be subject to antitrust scrutiny under section 105(c)), Judge Tamm observed:

> Finally, under section 186(a), . . ., the Commission has the power to revoke any type of license it has issued when there is a "violation of, or failure to observe any of the terms and provisions" of the Act. This section invests the Commission with a continuing "police" power over the activity of its licensees and provides it with the ability to take remedial action if a license is being used to restrain trade.

*Id.* at 281, 441 F.2d at 974.[6]

In 1970, one year after the *Statesville* decision, Congress amended the provisions of the Act governing the licensing and antitrust review of nuclear facilities. The 1970 amendments were, in effect, a congressional finding of "practical value," requiring the Commission thereafter to issue "commercial" licenses under section 103, rather than "research and development" licenses under section 104(b). Atomic Energy Act

---

**6.** In his concurring opinion, Judge Leventhal characterized as dicta the majority's conclusion that the Commission lacked authority to consider "affirmative anticipatory antitrust sanctions" in issuing construction permits and operating licenses under section 104(b). This was dicta, in his view, because petitioners' real concern was to obtain antitrust review of the operating licenses, not the construction permits, for the nuclear facilities in question, and the operating licenses might well issue under section

103. Moreover, in response to the majority's "hypothetical appraisal of how the situation might stand if the operating license issues were issued under § 104," Judge Leventhal saw "no sound basis for an intimation that the Commission is absolutely prohibited from taking antitrust considerations into account in fashioning reasonable terms and conditions for an operating license under § 104." 142 U.S.App.D.C. at 296, 441 F.2d at 986.

§ 102(a), 42 U.S.C. § 2132(a) (1976). The amendments, however, contained a grandfather clause governing nuclear facilities licensed for construction under section 104(b) at the time the amendments were enacted. Those facilities were to be licensed for operation under their prior status as section 104(b) facilities, thereby remaining (with a limited exception not applicable here) [7] exempt from prelicensing antitrust review under section 105(c). *Id.* § 102(b), 42 U.S.C. § 2132(b). Thus, Congress rejected the suggestion in *Statesville* that, in the event of a finding of "practical value," a licensee, having received a construction permit under section 104(b), would be required to obtain a section 103 operating license for the facility in question.

The Act as amended, and now currently in effect, carries forward the three basic areas of antitrust authority provided for prior to 1970. First, section 105(a), which was not amended, authorizes the Commission to suspend or revoke a license if the licensee is found by a court to have violated the antitrust laws in the course of licensed activity. Second, section 105(b), also not amended, requires the Commission to report to the Attorney General any information with respect to the utilization of atomic energy indicating a possible violation of the antitrust laws.

Third, section 105(c), which was amended, requires the Commission, when reviewing an application for a construction permit under section 103, to solicit the Attorney General's advice on antitrust matters, *id.* § 105(c)(1), 42 U.S.C. § 2135(c)(1), to publish such advice in the *Federal Register, id.* § 105(c)(5), 42 U.S.C. § 2135(c)(5), and to permit the Attorney General, where he advises "that there may be adverse antitrust aspects and recommends that there be a hearing," to participate as a party in any licensing proceedings with regard to anti-

trust matters, *id.* The Commission, however, retains final authority in licensing matters:

(5) . . . The Commission shall give due consideration to the advice received from the Attorney General and to such evidence as may be provided during the proceedings in connection with such subject matter, and shall make a finding as to whether the activities under the license would create or maintain a situation inconsistent with the antitrust laws as specified in [section 105(a)].

(6) In the event the Commission's finding under paragraph (5) is in the affirmative, the Commission shall also consider, in determining whether the license should be issued or continued, such other factors, including the need for power in the affected area, as the Commission in its judgment deems necessary to protect the public interest. On the basis of its findings, the Commission shall have the authority to issue or continue a license as applied for to refuse to issue a license, to rescind a license or amend it, and to issue a license with such conditions as it deems appropriate.

*Id.* § 105(c)(5), (6), 42 U.S.C. § 2135(c)(5), (6).

With regard to an application for an operating license under section 103, the antitrust review procedures under section 105(c) are not applicable unless the Commission makes the threshold determination that "such review is advisable on the ground that significant changes in the licensee's activities or proposed activities have occurred subsequent to the previous review by the Attorney General and the Commission . . . in connection with the construction permit for the facility." *Id.* § 105(c)(2), 42 U.S.C. § 2135(c)(2). No such antitrust review is permitted for an application for

---

**7.** This exception created a special class of section 104(b) operating licenses, which unlike other such licenses, were subject to prelicensing antitrust review under section 105(c). Such review of applications for section 104(b) operating licenses was authorized in cases where the party requesting antitrust review had raised the issue during the construction

permit proceedings and renewed the request in writing within a specified time period. Atomic Energy Act § 105(c)(3), 42 U.S.C. § 2135(c)(3) (1976). The exception is not applicable here, because, as indicated above, Florida Cities did not seek antitrust review at the construction permit stage, nor for that matter at the operating license stage.

an operating license under section 104(b) unless the person seeking such review requested antitrust review at the construction permit stage and renewed the request in writing within a specified time period. *Id.* § 105(c)(3), 42 U.S.C. § 2135(c)(3).

In addition, section 186(a), which was not amended in 1970, authorizes the Commission to revoke "[a]ny license . . . because of conditions revealed . . . which would warrant the Commission to refuse to grant a license on an original application."

## B.

█ It is also necessary, before turning to the merits, to say a brief word about this court's scope of review in the instant case. The issues presented here—(1) whether section 186(a) vests the Commission with antitrust authority over operating licenses other than that provided in section 105, and (2) if so, whether section 186(a) authorizes antitrust review of the section 104(b) operating licenses at issue here—both turn on matters of statutory interpretation. In this regard, we are cognizant of the general rule that "[t]he construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' " *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978) (quoting *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968)); *accord, Udall v. Tallman*, 390 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

█ To accord this deference, however, is not to abdicate our own duty to construe the statute for we are also mindful that "the courts are the final authorities on issues of statutory construction, . . . and 'are not obliged to stand aside and

rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " *SEC v. Sloan, supra,* 436 U.S. at 118, 98 S.Ct. at 1712 (quoting *Volkswagenwerk v. FMC, supra,* 390 U.S. at 272, 88 S.Ct. 929). In the instant case, where an agency is seeking to limit its own authority in an area not within its primary realm of responsibility, we must be especially vigilant to ensure that the agency is not shirking its statutory obligations.[8]

## III

Turning now to the merits, we examine first the question whether section 186(a), even assuming that it vests the Commission with antitrust authority over operating licenses other than that provided in section 105, authorizes postlicensing antitrust review of the section 104(b) licenses at issue here. In the proceedings below, the Appeal Board analyzed this question in terms of the "conditions revealed" clause of section 186(a), under which "[a]ny license may be revoked . . . because of conditions revealed . . . which would warrant the Commission to refuse to grant a license on an original application." It was the view of the Appeal Board that:

Even if we assume *arguendo* that section 186a [186(a)] means what Florida Cities assert it does, their cause is not advanced. The nuclear power plants in question were licensed under section 104b [104(b)]. As we have already explained, by Congressional mandate antitrust considerations were not grounds for refusing operating licenses to such "research and development" facilities.

J.A. 380.[9] In light of this observation, the Commission, supported by FP&L, now urges this court to conclude that section

8. This vigilance is evident, for example, in environmental cases involving government agencies whose primary mandates run counter to environmental concerns. *E. g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970); *see* Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509 (1974).

9. In his letter rejecting Florida Cities' request for antitrust review, the Director of Nuclear Reactor Regulation based his decision on "the reasons there stated," referring to the reasons stated in the Appeal Board's opinion. J.A. 398.

186(a), even if applicable to antitrust matters as a general rule, is not applicable in the instant case insofar as the Commission "was never 'warrant[ed] . . . to refuse to grant a license on an original application' to these facilities on the basis of findings directed to the competitive impact of licensing."

Florida Cities advance three arguments in reply. First, they assert that the Commission and FP&L have urged us to read the "conditions revealed" clause of section 186(a) in a manner inconsistent with the fact that it is written in the present conditional tense ("would warrant"), rather than the past conditional tense ("would [have] warrant[ed]"). It is Florida Cities' view that, because "section 186(a) is written in the subjunctive, applying *present* facts to the hypothetical 'original' license application," FP&L's operating plants must be treated as what they really are—viable commercial generating facilities that could be licensed today only under section 103. Treating these plants as section 103 facilities for the purposes of the "conditions revealed" clause, so the argument goes, would mean that antitrust review is authorized here insofar as Florida Cities' allegations of antitrust violations, if proven, "would warrant the Commission to refuse to grant a license on an original [section 103] application." In sum, Florida Cities advance an interpretation of the "conditions revealed" clause, under which section 104(b) licenses, which were exempt altogether from prelicensing antitrust review, would be subject to postlicensing antitrust review under the standards governing antitrust review of applications for section 103 licenses.

■ Neither side, in our view, has advanced a satisfactory interpretation of the "conditions revealed" clause of section 186(a). The Commission and FP&L have invited us, as Florida Cities assert, to ignore

the fact that the clause is written in the present conditional tense ("would warrant") and to interpret it instead as providing for the revocation of "[a]ny license . . . because of conditions revealed . . . which would [have] warranted[ed] the Commission to refuse to grant a license on an original application." We reject this invitation. It is significant, we think, that the "conditions revealed" clause applies to all licensing matters, including health, safety, and environmental considerations. Congress, when it enacted section 186(a) in 1954, must have envisioned that licensing standards, especially in the areas of health and safety regulation, would vary over time as more was learned about the hazards of generating nuclear energy. Insofar as those standards became more demanding, Congress surely would have wanted the new standards, if the Commission deemed it appropriate, to apply to those nuclear facilities already licensed.[10]   *Cf.* Atomic Energy Act § 187, 42 U.S.C. § 2237 (1976). It is our view, therefore, that the use of the present conditional tense ("would warrant"), rather than the past conditional tense ("would [have] warrant[ed]"), reflects a deliberate policy choice on the part of Congress when it enacted section 186(a) to render licenses for nuclear facilities subject to postlicensing review under evolving licensing standards, rather than under those standards applicable at the time the license in question was issued. Accordingly, we reject the Commission's interpretation of the "conditions revealed" clause.

Florida Cities urge us to interpret section 186(a) in a manner such that, for the purposes of license revocation under the "conditions revealed" clause, section 104(b) licenses would be treated as section 103 licenses. Section 186(a) provides, in relevant part, that "[a]ny license may be revoked . . . because of conditions revealed

---

10. By way of example, we believe that this clause of section 186(a) was designed to deal with a situation where, let us say, the Commission, after issuing a construction permit or operating license, determined that more demanding licensing standards than those applicable when the permit or license was issued were

necessary to accord adequate protection to the health of workers in nuclear plants. It is our view that Congress worded section 186(a) so as to permit the Commission to revoke the previously-issued permit or license if conditions revealed that the licensee did not meet the revised safety standards.

. . . which would warrant the Commission to refuse to grant a license on an original application." It is Florida Cities' position that, because section 186(a) is written in the present conditional tense, the term "original application" must refer to an original application not for the type of license being revoked, but rather for the type of license currently being issued for nuclear facilities similar to the facility in question.

■ We reject this interpretation as well. A more plausible reading of the "conditions revealed" clause, in our view, is that the term "original application" refers to an original application for the type of license being revoked. The significance we attach to the fact that section 186(a) is written in the present conditional tense is not that Congress intended to render licenses for nuclear facilities subject to postlicensing review under licensing standards for the type of license currently being issued for nuclear facilities similar to the facility in question, but rather that Congress intended to render licenses for nuclear facilities subject to postlicensing review under licensing standards currently applicable to the type of license in question.

This conclusion, we think, finds support in the legislative history of the 1970 amendments. Those amendments, though abolishing the requirement that the Commission make a finding of "practical value" before issuing section 103 licenses (which, unlike section 104(b) licenses, were subject to prelicensing antitrust review under section 105(c)), included a grandfather clause governing nuclear facilities, such as those at issue here, that had already been licensed for construction under section 104(b), but had not as yet been licensed for operation. Pursuant to the grandfather clause, the Act, as amended, permitted licensees holding construction licenses issued under section 104(b) at the time the amendments

were enacted to obtain operating licenses under section 104(b) as well, thereby retaining their exemption (with a limited exception not applicable here) from prelicensing antitrust review under section 105(c). *See* part II.A *supra.* Rejecting this court's "key ruling" in *Statesville* "that in the event of an intervening [finding] of practical value, the statute requires that [an] operating license be issued under section 103," [11] the Joint Committee on Atomic Energy concluded:

> [I]t would impose an unnecessary hardship on subsection 104b. licensees to compel them to convert their permits to section 103 licenses; the matter of potential antitrust review of certain subsection 104 licenses is specifically dealt with in section [105c(3)], and is discussed below, and it appears to the committee that no useful purpose could be served by compelling any conversion to section 103.[12]

H.R.Rep.No.1470, 91st Cong., 2d Sess. 26–27 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4981, 5007. This statement is consistent with tone of the hearings leading to the enactment of the 1970 amendments, where, for example, Representative Hosmer observed:

> With all the other woes suffered by these people who have followed the inducement of the Atomic Energy Commission to build plants to demonstrate the practical value of nuclear energy, I am wondering why, in good discretion, they ought not be left to proceed on the same basis they started as a matter of fairness, equity, and any of the other virtues that you might surmise.

*Prelicensing Antitrust Review of Nuclear Powerplants: Hearings Before the Joint Comm. on Atomic Energy,* 91st Cong., 1st & 2d Sess. 40 (1969–1970).

■ The legislative history of the grandfather clause suggests to us that Congress, by creating an exemption from the general

---

**11.** Cities of *Statesville v. Atomic Energy Commission, supra,* 142 U.S.App.D.C. at 294, 441 F.2d at 984 (Leventhal, J., concurring).

**12.** Section 105(c)(3) provides for prelicensing antitrust review of section 104(b) operating li-

censes in cases where the party requesting antitrust review raised the issue during the construction permit proceedings and renewed the request in writing within a specified time period. *See* note 7 *supra.*

requirement of prelicensing antitrust review, deliberately chose to single out section 104(b) licensees, such as FP&L, for special treatment in obtaining operating licenses. Inasmuch as the "conditions revealed" clause of section 186(a) is framed specifically in terms of the standards governing original license applications, we think it would be anomalous to interpret section 186(a) as authorizing postlicensing antitrust review under section 103 standards of the section 104(b) licenses at issue here, which, when reviewed as original license applications, were accorded by congressional mandate a special exemption from antitrust review. Accordingly, we reject Florida Cities' interpretation of the "conditions revealed" clause under which, for the purposes of license revocation, section 104(b) licenses would be treated as section 103 licenses.

■ It is our view instead that the "conditions revealed" clause is a grant of authority to revoke a license where conditions are revealed that would warrant the Commission, under current licensing standards for the type of license in question, to refuse to grant a license on an original application. Accordingly, inasmuch as antitrust considerations, under the licensing standards currently applicable to the type of license at issue here,[13] are not grounds that would warrant the Commission to refuse to grant a license on an original application,[14] we conclude that, under our reading of the "conditions revealed" clause, Florida Cities are not entitled to postlicensing antitrust review of FP&L's operating licenses.

■ The second argument advanced by Florida Cities in support of their view that

13. The licensing standards currently applicable to the type of license at issue here are those standards now governing the issuance of operating licenses under section 104(b). In this regard, we note that section 104(b) provides for the issuance of licenses not only for facilities licensed for construction under section 104(b) before the 1970 amendments were enacted, but also for facilities "for industrial or commercial purposes constructed or operated under an arrangement with the Commission entered into under the Cooperative Power Reactor Demonstration Program." Atomic Energy Act § 102(b), (c), 42 U.S.C. § 2132(b), (c) (1976). Accordingly, even after the Commission has issued operating licenses to all those section 104(b) facilities grandfathered in 1970, there will still be "currently applicable" licensing standards for section 104 operating licenses, namely, those standards governing the issuance of such licenses under the Cooperative Power Reactor Demonstration Program.

14. The section 104(b) operating licenses at issue here are exempt from prelicensing antitrust review under section 105(c), the only provision in the Act that expressly provides for such review. See Atomic Energy Act § 105(c)(3), 42 U.S.C. § 2135(c)(3) (1976). It is Florida Cities' view, however, that even if section 105(c) exempts these licenses from prelicensing antitrust review, the Commission is authorized to conduct such review directly under section 104(b), which provides:

As provided for in [subsection 102(b) or 102(c)], or where specifically authorized by law, the Commission is authorized to issue licenses under this subsection to persons applying therefor for utilization and production facilities for industrial and commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license *as will permit the Commission to fulfill its obligations under this chapter.* (emphasis added).

*Id.* § 104(b), 42 U.S.C. § 2134(b).

The short answer to this argument, in addition to the fact that it was rejected in *Statesville,* 142 U.S.App.D.C. at 284–85, 441 F.2d at 974–75, is that the Commission has no "obligations under this chapter" with regard to prelicensing antitrust review other than those provided in section 105(c). Moreover, with regard to prelicensing antitrust review of section 104(b) licenses under the 1970 amendments, the Joint Committee on Atomic Energy observed that:

[I]t would impose an unnecessary hardship on subsection 104b. licensees to compel them to convert their permits to section 103 licenses; *the matter of potential antitrust review of certain subsection 104 licenses is specifically dealt with in section [105c(3)],* and is discussed below, and it appears to the committee that no useful purpose could be served by compelling any conversion to section 103. H.R.Rep.No.1470, 91st Cong., 2d Sess. 26–27 (1970), U.S.Code Cong. & Admin.News 1970, p. 5007 (emphasis added). It is our view, therefore, that section 105(c), which exempts the operating licenses at issue here, is the Commission's exclusive grant of prelicensing antitrust authority over section 104(b) operating licenses.

antitrust review is authorized in the instant case focuses on a clause of section 186(a) the Appeal Board never discussed, namely, the clause authorizing the Commission to revoke a license in cases involving a "violation of, or failure to observe any of the terms and provisions of this chapter. ... ." This clause, according to Florida Cities, authorizes antitrust review here because (1) the phrase "terms and provisions of this chapter" in section 186(a) refers to, among other things, "the continuing obligation of all licensees to comport with the antitrust laws under section 105(a)," and (2) FP&L has failed to observe this continuing obligation by violating the antitrust laws in the course of licensed activity.

This argument, we think, falls short of the mark. Section 105 provides:

Nothing contained in this chapter shall relieve any person from the operation of sections 1 to 13, 14 to 19, 20, 21, 22 to 27, 41 to 46, and 47 to 58 of Title 15 and sections 52 and 53 of Title 29. In the event a licensee is found by a court of competent jurisdiction, either in an original action in that court or in a proceeding to enforce or review the findings or orders of any Government agency having jurisdiction under the sections cited above, to have violated any of the provisions of such sections in the conduct of the licensed activity, the Commission may suspend, revoke, or take such other action as it may deem necessary with respect to

any license issued by the Commission under the provisions of his chapter.

It is our view that the first quoted sentence, rather than creating—as Florida Cities suggest—an independent obligation on the part of licensees to comport with the antitrust laws, simply provides that those laws are not preempted by the Act. To say that the antitrust laws listed in the savings clause of section 105(a) are "terms and provisions of this chapter" within the meaning of section 186(a) is to strain to an excessive degree the language of both statutory provisions.

It is particularly inappropriate to equate the antitrust laws with "terms and provisions of this chapter," in light of fact that interpreting section 186(a) as authorizing the Commission to revoke a license when a licensee has violated the antitrust laws would render superfluous the second sentence of section 105(a), which authorizes the Commission to revoke a license when a court finds that a licensee has violated the antitrust laws. The rules of statutory construction militate against such an interpretation. It is our view, therefore, that, under either clause of section 186(a) cited by Florida Cities, the Commission, whether acting through its licensing boards or the Director of Nuclear Reactor Regulation, is without authority to conduct postlicensing antitrust review of the section 104(b) operating licenses at issue here.[15]

---

**15.** This conclusion is not, we think, inconsistent with the observation in *Statesville* that:

Finally, under section 186(a), . . . . the Commission has the power to revoke any type of license it has issued when there is a "violation of, or failure to observe any of the terms and provisions" of the Act. This section invests the Commission with a continuing "police" power over the activity of its licensees and provides it with the ability to take remedial action if a license is being used to restrain trade.

142 U.S.App.D.C. at 284, 441 F.2d at 974. The court in *Statesville* made reference to section 186(a) only to demonstrate that, under the pre-1970 Act, its conclusion that the Commission was not authorized to consider antitrust matters in issuing construction permits for the "research and development" facilities there involved would "not preclude the Commission from keeping an administrative eye on anti-

competitive effects of the use of these facilities once they are constructed." *Id.* at 283, 441 F.2d at 973. Moreover, in the sentence immediately preceding its discussion of section 186(a) quoted above, the *Statesville* court strongly suggested that the facilities there at issue, though licensed for construction under section 104(b), would have to be licensed for operation under section 103.

With regard to section 103 operating licenses and those section 104(b) operating licenses subject to prelicensing antitrust review, we do not foreclose the possibility that the Commission has postlicensing antitrust authority under section 186(a). In fact, we expressly reserve judgment on that question. *See* note 17 *infra*. We hold here only that if the Commission has such authority its source is not, as *Statesville* suggested, the clause of section 186(a) permitting license revocation "for violation of, or failure to observe any of the terms and provisions

Florida Cities' third, and final, argument is that, even assuming the Commission is correct in suggesting that section 186(a) is, by its own terms, inapplicable to the licenses at issue here, we cannot affirm the Commission on this point because the decisions under review rested solely on another ground, namely, that section 105 is the Commission's exclusive grant of antitrust authority in licensing nuclear facilities. In this regard, Florida Cities note that the Appeal Board, after explaining why it thought that the licenses at issue here did not fall within the ambit of section 186(a), concluded:

> But even accepting everything [Florida Cities] say, no construction of section 186 need be made here. As we explain in Part III [which presented the argument that section 105 is the Commission's exclusive grant of antitrust authority], other grounds compel rejection of their contentions.

J.A. 380. This passage, in Florida Cities' view, reveals that the Appeal Board and the Director of Nuclear Reactor Regulation (who based his decision on the reasons stated in the Appeal Board's opinion) suggested, but did not rely, on the ground that section 186(a), by its own terms, does not authorize postlicensing antitrust review in the instant case. The Commission's reliance here upon a ground suggested, but not relied on, in the decisions below is, so the argument goes, a *post hoc* rationalization

that we may not accept as a proper basis for affirming the decisions under review.

■ We have no quarrel with the legal principles underlying this argument. It is well settled that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). In *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), the Supreme Court summarized a "simple but fundamental" rule of administrative law:

> That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

This rule seeks "not to deprecate, but to vindicate . . . the administrative process, for the purpose of the rule is to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Burlington Truck Lines, Inc. v. United States, supra*, 371 U.S. at 169, 83 S.Ct. at 246 (quoting *SEC v. Chenery Corp., supra*, 332 U.S. at 196, 67 S.Ct. 1575).

of this chapter," *see* pages ———— of 196 U.S.App.D.C., page 999 of 606 F.2d *supra*, but rather the clause permitting license revocation "because of conditions revealed . . . which would warrant the Commission to refuse to grant a license on an original application," *see* pages ————— of 196 U.S.App. D.C., pages 996–998 of 606 F.2d *supra*. This is not, we think, a significant departure from *Statesville* inasmuch as the court there cited section 186(a) for the proposition that the provision vested the Commission with postlicensing antitrust authority over the licenses there involved, not for the proposition that the source of this authority was the clause of section 186(a) providing for license revocation where a licensee has violated the "terms and provisions of this chapter."

That facilities, such as those at issue here, would be licensed for operation under section 104(b) even though Congress had abolished the

required finding of "practical value" was not, and could not have been, within the contemplation of the court in *Statesville*. In fact, the *Statesville* decision was premised on precisely the opposite view, namely, that the statute required that, in the event of an intervening finding of practical value, facilities licensed for construction under section 104(b) would have to be licensed for operation under section 103. It is our view, therefore, that, inasmuch as the instant case involves a class of licenses accorded a unique antitrust status after *Statesville* was decided, we cannot regard as controlling here the broad observation made there that section 186(a) vests the Commission with postlicensing antitrust jurisdiction over "any type of license." Our analysis in the instant case reveals, to the contrary, that Congress did not intent to vest the Commission with such authority over the operating licenses at issue here.

■ Our reading of the record, however, differs from that of Florida Cities. The theory that section 186(a) does not, by its own terms, authorize postlicensing antitrust review of the licenses at issue here was, we think, not dicta, but rather an alternative ground for the Appeal Board's decision. The Appeal Board's conclusion that "no construction of section 186 need be made here [because] . . . other grounds compel rejection of [Florida Cities'] contentions" was meant to indicate that there existed an alternative ground for decision, not that the Appeal Board was relying exclusively on that alternative ground.[16] Although the concluding passage quoted above could have been written more precisely, we are guided by the Supreme Court's observation:

> While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted). We conclude, therefore, that the *Chenery* doctrine is inapposite here inasmuch as the Appeal Board's decision included as an alternative ground for decision, rather than as dicta, the theory that even assuming that section 186(a) vests the Commission with antitrust authority over operating licenses other than that provided in section 105, it does not, by its own terms, authorize postlicensing antitrust review of the licenses at issue here. It is on this alternative ground for decision, and this ground alone, that we affirm the decisions under review.[17]

## IV

■ In summary, we hold that even assuming that section 186(a) vests the Com-

mission with antitrust authority over operating licenses other than that provided in section 105, it does not, by its own terms, authorize postlicensing antitrust review of the section 104(b) operating licenses at issue here. This decision turns on our view that section 186(a) is not a plenary grant of authority to revoke a license, but rather a limited grant of such authority applicable only where conditions are revealed that would warrant the Commission, under current licensing standards for the type of license in question, to refuse to grant a license on an original application. In the instant case, involving section 104(b) operating licenses which are exempt under current licensing standards from prelicensing antitrust review, Florida Cities are not entitled to postlicensing antitrust review under section 186(a) inasmuch as their allegations of antitrust violations, even if true, would not warrant the Commission to refuse to grant a license on an original application.

To so immunize the licenses at issue here from postlicensing antitrust review under section 186(a) is not, as Florida Cities assert, to give FP&L a "carte blanche to use [its] facilities directly contrary to the antitrust laws." Section 105(a) not only provides that nothing in Act preempts the normal operation of the antitrust laws, but also vests the Commission with authority to revoke or modify FP&L's operating licenses in the event that a court finds that FP&L has violated those laws in the course of licensed activity. Moreover, the Commission, acting pursuant to section 105(b), has already forwarded Florida Cities' antitrust allegations to the Justice Department. Accordingly, we affirm the decisions under review.

*It is so ordered.*

## APPENDIX

Section 102 of the Atomic Energy Act, 42 U.S.C. § 2132 (1976), provides:

**16.** It is significant, we think, that the passage quoted above served not only as the conclusion to the discussion regarding whether section 186(a), by its own terms, authorizes postlicensing antitrust review of the licenses at issue here, but also as a transition to the discussion regarding whether section 105 is the Commis-

sion's exclusive grant of antitrust authority in licensing nuclear facilities.

**17.** We need not, and do not, reach the question whether section 105 is the Commission's exclusive grant of antitrust authority over operating licenses for nuclear facilities.

(a) Except as provided in subsections (b) and (c) of this section, or otherwise specifically authorized by law, any license hereafter issued for a utilization or production facility for industrial or commercial purposes shall be issued pursuant to section 2133 of this title.

(b) Any license hereafter issued for a utilization or production facility for industrial or commercial purposes, the construction or operation of which was licensed pursuant to section 2134(b) of this title prior to enactment into law of this subsection, shall be issued under section 2134(b) of this title.

(c) Any license for a utilization or production facility for industrial or commercial purposes constructed or operated under an arrangement with the Commission entered into under the Cooperative Power Reactor Demonstration Program shall, except as otherwise specifically required by applicable law, be issued under section 2134(b) of this title.

Section 103 of the Atomic Energy Act, 42 U.S.C. § 2133 (1976), provides in relevant part:

(a) The Commission is authorized to issue licenses to persons applying therefor to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, use, import, or export under the terms of an agreement for cooperation arranged pursuant to section 2153 of this title, utilization or production facilities for industrial or commercial purposes. Such licenses shall be issued in accordance with the provisions of subchapter XV of this chapter and subject to such conditions as the Commission may by rule or regulation establish to effectuate the purposes and provisions of this chapter.

(b) The Commission shall issue such licenses on a nonexclusive basis to persons applying therefor (1) whose proposed activities will serve a useful purpose proportionate to the quantities of special nuclear material or source material to be utilized; (2) who are equipped to observe and who agree to observe such safety standards to protect health and to minimize danger to life or property as the Commission may by rule establish; and (3) who agree to make available to the Commission such technical information and data concerning activities under such licenses as the Commission may determine necessary to promote the common defense and security and to protect the health and safety of the public. All such information may be used by the Commission only for the purposes of the common defense and security and to protect the health and safety of the public.

Section 104 of the Atomic Energy Act, 42 U.S.C. § 2134 (1976), provides in relevant part:

(b) As provided for in subsection (b) or (c) of section 2132 of this title, or where specifically authorized by law, the Commission is authorized to issue licenses under this subsection to persons applying therefor for utilization and production facilities for industrial and commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its obligations under this chapter.

Section 105 of the Atomic Energy Act, 42 U.S.C. § 2135 (1976), provides in relevant part:

(a) Nothing contained in this chapter shall relieve any person from the operation of sections 1 to 13, 14 to 19, 20, 21, 22 to 27, 41 to 46, and 47 to 58 of Title 15 and sections 52 and 53 of Title 29. In the event a licensee is found by a court of competent jurisdiction, either in an original action in that court or in a proceeding to enforce or review the findings or orders of any Government agency having jurisdiction under the sections cited above, to have violated any of the provisions of such sections in the conduct of the licensed activity, the Commission may suspend, revoke, or take such other action as it may deem necessary with respect to any license issued by the Commission under the provisions of this chapter.

(b) The Commission shall report promptly to the Attorney General any information it may have with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation of any of the foregoing sections, or to restrict free competition in private enterprise.

(c)(1) The Commission shall promptly transmit to the Attorney General a copy of any license application provided for in paragraph (2) of this subsection, and a copy of any written request provided for in paragraph (3) of this subsection; and the Attorney General shall, within a reasonable time, but in no event to exceed 180 days after receiving a copy of such application or written request, render such advice to the Commission as he determines to be appropriate in regard to the finding to be made by the Commission pursuant to paragraph (5) of this subsection. Such advice shall include an explanatory statement as to the reasons or basis therefor.

(2) Paragraph (1) of this subsection shall apply to an application for a license to construct or operate a utilization or production facility under section 2133 of this title: *Provided, however,* That paragraph (1) shall not apply to an application for a license to operate a utilization or production facility for which a construction permit was issued under section 2133 of this title unless the Commission determines such review is advisable on the ground that significant changes in the licensee's activities or proposed activities have occurred subsequent to the previous review by the Attorney General and the Commission under this subsection in connection with the construction permit for the facility.

(3) With respect to any Commission permit for the construction of a utilization or production facility issued pursuant to subsection (b) of section 2134 of this title prior to December 19, 1970, any person who intervened or who sought by timely written notice to the Commission to intervene in the construction permit proceeding for the facility to obtain a determination of antitrust considerations or to advance a jurisdictional basis for such determination shall have the right, upon a written request to the Commission, to obtain an antitrust review under this section of the application for an operating license. Such written request shall be made within 25 days after the date of initial Commission publication in the Federal Register of notice of the filing of an application for an operating license for the facility or December 19, 1970, whichever is later.

. . .

(5) Promptly upon receipt of the Attorney General's advice, the Commission shall publish the advice in the Federal Register. Where the Attorney General advises that there may be adverse antitrust aspects and recommends that there be a hearing, the Attorney General or his designee may participate as a party in the proceedings thereafter held by the Commission on such licensing matter in connection with the subject matter of his advice. The Commission shall give due consideration to the advice received from the Attorney General and to such evidence as may be provided during the proceedings in connection with such subject matter, and shall make a finding as to whether the activities under the license would create or maintain a situation inconsistent with the antitrust laws as specified in subsection (a) of this section.

(6) In the event the Commission's finding under paragraph (5) is in the affirmative, the Commission shall also consider, in determining whether the license should be issued or continued, such other factors, including the need for power in the affected area, as the Commission in its judgment deems necessary to protect the public interest. On the basis of its findings, the Commission shall have the authority to issue or continue a license as applied for, to refuse to issue a license, to rescind a license or amend it, and to issue a license with such conditions as it deems appropriate.

Section 186 of the Atomic Energy Act, 42 U.S.C. § 2236 (1976), provides in relevant part:

(a) Any license may be revoked for any material false statement in the application or any statement of fact required under section 2232 of this title, or because of conditions revealed by such application or statement of fact or any report, record, or inspection or other means which would warrant the Commission to refuse to grant a license on an original application, or for failure to construct or operate a facility in accordance with the terms of the construction permit or license or the technical specifications in the application, or for violation of, or failure to observe any of the terms and provisions of this chapter or of any regulation of the Commission.